1

2

3

4

5

6

7

8

## UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11  EBS AUTOMOTIVE SERVICES; ABF               CASE NO. 09-CV-996 JLS (MDD)
    TECHNOLOGIES, INC.,
12                                             **ORDER: (1) DENYING**
                                 Plaintiffs,   **PLAINTIFFS' MOTION FOR**
                                               **SUMMARY ADJUDICATION FOR**
13        vs.                                  **INFRINGEMENT; (2) DENYING**
                                               **DEFENDANT'S MOTION FOR**
14                                             **SUMMARY JUDGMENT OF**
                                               **INVALIDITY**
15  ILLINOIS TOOL WORKS, INC.,

16                               Defendant.    (ECF Nos. 99, 100)

17

18          Presently before the Court are (1) Plaintiffs EBS Automotive Services (EBS) and ABF

19  Technologies, Inc.'s (ABF) (collectively, Plaintiffs) motion for summary adjudication for infringement

20  of claims 1, 3–7, 9–12, 14 and 15 of U.S. Patent No. 6,206,055 (the '055 patent) (ECF No. 99); and

21  (2) Defendant Illinois Tool Works, Inc.'s (ITW) motion for summary judgment of invalidity of the

22  '055 patent (ECF No. 100).  Also before the Court are the parties' respective oppositions, replies, and

23  post-hearing supplemental briefs.  (Pls.' Opp'n, ECF No. 108; ITW's Opp'n, ECF No. 109; Pls.'

24  Reply, ECF No. 114; ITW's Reply, ECF No. 117; Pls.' Suppl. Br., ECF No. 141; ITW's Suppl. Br.,

25  ECF No. 142.)  Having carefully considered the parties' arguments and the law, the Court **DENIES**

26  both motions.

27  //

28  //

1

**BACKGROUND**

2   EBS is a California corporation with its principal place of business located in Westminster,

3   California.  (FAC ¶ 4, ECF No. 87.)  ABF, also a California corporation, has its principal place of

4   business in Fresno, California.  (*Id.* ¶ 5.)  ITW is a publicly traded Delaware corporation with its

5   principal executive offices in Illinois.  Illinois Tool Works Inc., Annual Report (Form 10-K) (Feb. 28,

6   2011).  ITW "is a multinational manufacturer of a diversified range of industrial products and

7   equipment with approximately 840 operations in 57 countries."  *Id.* at 2. ITW's businesses are

8   internally reported as 60 operating segments. *Id.* at 14.  Among these operating segments is Wynn's.[1]

9   (*See* ITW's Opp'n 1 (indicating that ITW does business as Wynn's).)

10   The '055 patent is jointly owned by EBS and ABF.  (FAC ¶¶ 10–11.)  The '055 patent claims

11   "[a]n apparatus and method for removing, flushing contaminants from[,] and replacing vehicle brake

12   fluid."  U.S. Patent No. 6,206,055, at [57] (filed Oct. 7, 1999).

13   Before the invention of the apparatus and method claimed in the '055 patent, "changing brake

14   fluid was a laborious task."  (Pls.' Mem. ISO MSJ 3; *see also* '055 Patent col.3 ll.10–14 ("The prior

15   art method of replacing brake fluid takes two people about 45 minutes to an hour to remove and

16   replace the brake fluid.  The prior art method also requires additional time to clean up the resulting

17   spillage that is essentially inherent in the prior art method.").)  The conventional manual method of

18   changing brake fluid "required one technician to sit in the driver's seat and 'pump' the brake with his

19   foot while a second technician opened a brake bleeder valve at each wheel.  The pumping motion

20   forced the brake fluid through the bleeder valve and out of the system."  (Hollub Decl. ISO Pls.' MSJ

21   ¶ 11, ECF No. 108-1 .)  "This process would be repeated many times until all of the air bubbles were

22   removed from the brake lines."  (*Id.*)

23   Moreover, the prior art method of replacing brake fluid is "carried out in an open air

24   environment whereby the fluid is exposed to the atmosphere as the brake system is being drained and

25   new fluid is added."  '055 Patent col.2 ll.49–52.  "Unfortunately, new brake fluid can become

26

---

27
28   [1] The parties briefing refers to the Defendant in this case—ITW—as Wynn's. (*See, e.g.*, Pls.'
Mem. ISO MSJ 1, ECF No. No. 99-1; ITW's Mem. ISO MSJ 4, ECF No. 100-1.)  Because of the
inherent difficulty in forming the possessive of "Wynn's," the Court refers to ITW as ITW, unless
directly quoting another source.

09cv996

1  contaminated with moisture, air[,] and particulates as soon as the brake fluid container is opened and

2  poured into the brake system due to the typical open system method used to flush and replace used

3  brake fluid." *Id.* col.3 ll.20–24.  Further, "[b]rake fluid is highly toxic, and damaging to air, water,

4  and people exposed to it."  (Hollub Decl. ISO Pls.' MSJ ¶ 7; *accord* '055 Patent col.2 ll.45–47,

5  52–54.)

6         The invention of the apparatus and method claimed in the '055 patent "ended the laborious and

7  dangerous manual method [of changing brake fluid] by implementing a completely automated way

8  of removing and replacing brake fluid." (Pl.'s Mem. ISO MSJ 4.)  In summary, the apparatus claimed

9  by the '055 patent combines a fill pump and a vacuum pump, along with "various fluid control and

10  measuring devices, fluid tanks, and an electronic mechanism." '055 Patent col.4 ll.29–31.  Because

11  it uses both a fill pump and a vacuum pump (Hollub Decl. ISO Pls.' MSJ ¶ 9), and operates as a closed

12  system, '055 Patent col.3 ll.53–54, the invention allows the user to replace brake fluid more quickly

13  than is possible under the prior art method and without exposing the brake fluid to the environment,

14  *id.* col.4 ll.22–37.

15         ITW allegedly has infringed and continues to infringe the '055 patent through its manufacture,

16  use, sale, and distribution "of brake machines and related fluids," including the Wynn's BrakeTech

17  Rapid Fluid Exchange Machine (the BrakeTech).  (FAC ¶ 12.)  Like the invention claimed in the '055

18  patent, the BrakeTech incorporates both "pressure bleeding/flushing" and "vacuum bleeding."

19  (Hischier Decl. ISO ITW's Opp'n ¶ 2, ECF  No. 109-2.)  However, in contrast to the invention

20  claimed in the '055 patent, the BrakeTech does not operate as a closed system; rather, the new fluid

21  and used fluid containers "sit[] on top of the chassis," which exposes the old and new brake fluid to

22  the environment.  (*Id.* at ¶¶ 5–6.)

23         On May 8, 2009, Plaintiffs commenced this action accusing ITW of infringing the '055 patent.

24  (ECF No. 1.)  The Court held a claim construction hearing on April 9, 2010.  (Minute Entry, April 9,

25  2010, ECF No. 58; Claim Construction Order, ECF No. 68.)  The operative first amended complaint

26  was filed on October 20, 2010.[2]  (FAC.)

27  _____

28         [2] The first amended complaint also named MOC Products Company, Inc. (MOC) as a plaintiff
(FAC ¶ 11) and CMC Industries, Inc. (CMC) as a defendant (FAC ¶ 13).  On January 4, 2011, the
Court dismissed MOC for lack of standing (ECF No. 126), and on January 10, 2011, the Court

1

**LEGAL STANDARD**

2          Federal Rule of Civil Procedure 56 permits a court to grant summary judgment where (1) the

3   moving party demonstrates the absence of a genuine issue of material fact and (2) entitlement to

4   judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Material," for

5   purposes of Rule 56, means that the fact, under governing substantive law, could affect the outcome

6   of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Shum v. Intel Corp.*, 633 F.3d

7   1067, 1076 (Fed. Cir. 2010).  For a dispute to be "genuine," a reasonable jury must be able to return

8   a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 248.

9          The initial burden of establishing the absence of a genuine issue of material fact falls on the

10  moving party.  *Celotex*, 477 U.S. at 323.  The movant can carry his burden in two ways: (1) by

11  presenting evidence that negates an essential element of the nonmoving party's case; or (2) by

12  demonstrating that the nonmoving party "failed to make a sufficient showing on an essential element

13  of her case with respect to which she has the burden of proof."  *Id.* at 322–23.  "Disputes over

14  irrelevant or unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec. Serv., Inc.*

15  *v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

16         Once the moving party establishes the absence of genuine issues of material fact, the burden

17  shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed fact remains.

18  *Celotex*, 477 U.S. at 324.  The nonmoving party cannot oppose a properly supported summary

19  judgment motion by "rest[ing] on mere allegations or denials of his pleadings."  *Anderson*, 477 U.S.

20  at 256.  When ruling on a summary judgment motion, the court must view all inferences drawn from

21  the underlying facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co.*

22  *v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

23         "Summary judgment is as appropriate in a patent case as it is in any other case."  *Desper*

24  *Prods., Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1332 (Fed. Cir. 1998) (quoting *C.R. Bard, Inc. v.*

25  *Advanced Cardiovascular, Inc.*, 911 F.2d 670, 672 (Fed. Cir. 1990)) (internal quotation marks

26  omitted).  "When presented with patent validity and infringement issues, trial courts should . . . decide

27  both."  *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1540 (Fed. Cir. 1983); *see also Sinclair &*

28  ───────────────────

    dismissed CMC pursuant to the parties' joint motion (ECF No. 129).

*Carroll Co. v. Interchemical Corp.*, 325 U.S. 327, 330 (1945) (holding that "better practice" in patent suits is to inquire fully into validity, rather than dispose of them on the ground of non-infringement alone).

### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT

Plaintiffs move for summary judgment on the issue of infringement of claims 1, 3–7, 9–12, 14, and 15 of the '055 patent.[3,4]  (Pls.' Mem. ISO MSJ 1.)  Plaintiffs' theory is one of direct infringement, *see* 35 U.S.C. § 271(a), as opposed to one of inducing infringement, *see id.* § 271(b), or contributory infringement, *see id.* § 271(c).  (*See* Pl.'s Mem. ISO MSJ 6 ("Wynn's BrakeTech directly infringes claims 1, 3–7, 9–12, 14, and 15 of the '055 patent."); *id.* at 9 (alleging that ITW offers to sell, sells, and uses the BrakeTech).)  Specifically, Plaintiffs contend that "there is substantial, irrefutable evidence including a parts list, operating manual, Wynn's instructional video, and a detailed illustration depicting where each and every limitation [of the '055 patent] is found on" the BrakeTech. (*Id.* at 6.)

### 1.    Legal Standard

Under 35 U.S.C. 271(a), "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . infringes the patent."  A patent infringement analysis proceeds in two steps. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd* 517 U.S. 370.  In the first step, the court construes the asserted claims as a matter of law.[5]  *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456, 1466 (Fed. Cir. 1998).  In the second step, the factfinder compares the claimed invention to the accused device.  *Id.* at 1467; *see also Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*, 602 F.3d 1325, 1340 (Fed. Cir. 2010) ("A determination of

---

[3]  Claims 1, 6, and 12 are independent claims; the rest are dependent claims.  *See* '055 Patent col.8 l.6 to col.10 l.62.  If the Court finds as a matter of law that claim 1 is not infringed, then claims 3–5, which depend from and include all limitations of claim 1, are not infringed as a matter of law. *See Kim v. ConAgra Foods*, 465 F.3d 1312, 1316 n.1 (Fed. Cir. 2006); *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989) ("One who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim."). The same goes for claim 7 and claims 9–11, which depend from and include all limitations of claim 6, and claims 14 and 15, which depend from and include all limitations of claim 12.

[4]  Claims 1, 3–7, and 9–11 are apparatus claims; the rest are method claims.

[5]  The Court construed the asserted claims of the '055 patent on June 28, 2010.  (*See* Claim Construction Order.)

infringement is a question of fact . . . ."). "Summary judgment on the issue of infringement is proper when no reasonable jury could find that every limitation in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." *U.S. Philips Corp. v. Iwasaki Elec. Co. Ltd.*, 505 F.3d 1371, 1374–75 (Fed. Cir. 2007) (quoting *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005)) (internal quotation marks omitted); *see also Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003) ("[A] determination of infringement . . . is a question of fact. Thus . . . , summary judgment is proper only if 'no reasonable jury could return a verdict for the nonmoving party.'" (quoting *Anderson*, 477 U.S. at 255)).

"To prove literal infringement, the patentee must show that the accused device contains every limitation in the asserted claims. If even one limitation is missing or not met as claimed, there is no literal infringement."[6] *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1308 (Fed. Cir. 2002) (quoting *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998)).

**2.    Analysis**

*A.    Independent Apparatus Claims (Claims 1 and 6)*

Plaintiffs assert that ITW infringes several of the '055 patent's apparatus claims by making, using, offering to sell, and selling the BrakeTech .  (*See* Pls.' Mem. ISO MSJ 7–16.)  Among the apparatus claims, two—claims 1 and 6—are independent.  *See supra* note 3.  Claims 1 and 6 both recite "[a]n apparatus for removing and replacing hydraulic fluid used in a hydraulic fluid system in a vehicle," '055 Patent col.8 ll.7–9 (claim 1); *id.* col.8 ll.51–53 (claim 6), and contain substantially the same limitations, *compare id.* col.8 ll.7–33, *with id.* col.8 l.51 to col.9 l.13; *see also* Pls.' Mem. ISO MSJ 14 ("Claim 6 contains the same elements as Claim [1] with the single addition of the last

---

[6]   "Even where the accused device does not literally infringe, the patentee may prove infringement under the doctrine of equivalents." *Int'l Gamco, Inc. v. Multimedia Games, Inc.*, 732 F. Supp. 2d 1082, 1093 (S.D. Cal.2010) (Sammartino, J.) (citing *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000)). "[U]nder the doctrine of equivalents, infringement occurs when the allegedly infringing device and claimed limitations perform 'substantially the same function in substantially the same way to obtain substantially the same result.'" *Id.* (quoting *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 38 (1997)).  In this motion, Plaintiffs do not seek summary judgment of infringement under the doctrine of equivalents; rather, they rely exclusively on a theory of literal infringement. (*See* Pls.' Mem. ISO MSJ 6–19 (arguing that the BrakeTech contains every limitation of the asserted claims).)  Accordingly, the Court does not address whether ITW infringes under the doctrine of equivalents.

1    'suction hose' element . . . ."). Below, the Court addresses the various ways in which Plaintiffs

2    contend that ITW infringes the '055 patent—making or selling the patented combination; offering to

3    sell it; and using it.

4    *(1)*      *Whether ITW Makes or Sells the Patented Combination*

5          To determine whether ITW makes or sells the patented combination, the Court addresses each

6    common limitation or group of common limitations in turn.[7]

7    (a)    First limitation

8          The first limitation of claims 1 and 6 is "a housing."  '055 Patent col.8 l.10 (claim 1); *id.* col.8

9    l.54 (claim 6).  The Court construed this limitation as comprising "a case, enclosure, receptacle, or

10   support frame for mechanical parts."  (Claim Construction Order 3.)

11         Plaintiffs contend that the BrakeTech's chassis (*see* Kneafsey Decl. ISO Pls.' MSJ Ex. 2, ECF

12   Nos. 99-2, 99-4 to -43 (pictures depicting BrakeTech)), "is a housing since it is, at the very least, a

13   receptacle or support frame" for containers of brake fluid.  (Pls.' Mem. ISO MSJ 8.)  ITW responds

14   that "the containers of brake fluid placed on top of the BrakeTech chassis are <u>not</u> 'mechanical parts.'"

15   (ITW's Opp'n 8 (emphasis in original).)  Plaintiffs reply that ITW's argument "lacks common sense

16   because the claim language itself describes a tank in the housing.  If a tank is not a mechanical part,

17   then no tank would ever meet this limitation—not even the preferred embodiment."  (Pls.' Reply 3.)

18   As further evidence that the brake fluid containers "are mechanical parts in the housing," Plaintiffs

19   point to the fact that ITW itself has assigned part numbers to the containers of new brake fluid and the

20   waste tank.  (*Id.*)

21         The Court agrees with Plaintiffs.  As the parties frame it, whether the BrakeTech's chassis

22   constitutes a housing as required by the first limitation turns on whether the brake fluid containers are

23   "mechanical parts."  *Webster's Third New International Dictionary* defines "mechanical" as "of,

24   relating to, or concerned with machinery or tools."  WEBSTER'S THIRD NEW INTERNATIONAL

25   DICTIONARY 1400 (1971); *accord* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH

26   LANGUAGE 1087 (4th ed. 2000) ("Of or relating to machines or tools.").  In context, the containers are

27

28         [7] The Court does not address the seventh limitation of claims 1 and 6 because ITW does not
dispute that the BrakeTech meets it.

"of" or "relating to" a machine because they are integral parts of the BrakeTech—it could not function without them.  (*See* Arnold Decl. ISO ITW's Opp'n Ex. A, at 15, ECF Nos. 109-3 to -7 (describing how the BrakeTech uses new brake fluid and waste fluid containers).)  That ITW has assigned part numbers to the containers further supports this conclusion.  (*See* Kneafsey Decl. ISO Pls.' MSJ Ex. 6, at 48; *id.* Ex. 8.)  Thus, the Court finds that the containers are mechanical parts.

Furthermore, the BrakeTech's chassis is clearly a "a case, enclosure, receptacle, or support frame for mechanical parts" beyond the brake fluid containers.  (Claim Construction Order 3.)  ITW's BrakeTech Assembly Instructions and Parts List clearly depicts a pressure pump assembly and vacuum pump assembly enclosed within the chassis.  (*See* Kneafsey Decl. ISO Pls.' MSJ Ex. 6, at 44, 54, 56–57, 59; *see also id.* Ex. 2, at 20–21 (pictures of BrakeTech with control panel removed).)  And the chassis supports a "control panel assembly" consisting of, *inter alia*, a toggle switch block, pressure gauge, and rocker switch.  (*See id.* Ex. 6, at 42–43, 54, 57.)  The Court doubts that ITW would define these items as anything other than "mechanical parts."  Accordingly, there is no genuine issue of material fact that the BrakeTech meets the first limitation.[8]

(b)      Second and Third Limitations

The second limitation of claims 1 and 6 is "a fresh fluid tank in said housing for storing a source of fresh hydraulic fluid for use in the vehicle."  '055 Patent col.8 ll.11–12 (claim 1); *id.* col.8 ll.55–56 (claim 6).  The third limitation of claims 1 and 6 is "a waste fluid tank in said housing for receiving and storing a source of waste hydraulic fluid received from the vehicle."  *Id.* col.8 ll.13–15 (claim 1); *id.* col.8 ll.57–59 (claim 6).  The Court construed the terms "fresh fluid tank" and "waste fluid tank" to mean "a container for fresh hydraulic fluid" and "a container for used hydraulic fluid," respectively.  (Claim Construction Order 3.)

---

[8] Further, although ITW argues in its opposition that "Plaintiffs have not . . . established that the chassis is a case, enclosure, receptacle[,] or support frame for mechanical parts" (ITW's Opp'n 8), in its response to Plaintiffs' separate statement of undisputed material facts, ITW "admits that the chassis of the BrakeTech Machine is a case, enclosure, receptacle, or support frame for mechanical parts" (ITW's Resp. to Pls.' SSUMF 1, ECF No. 109-1).  This statement is a binding judicial admission by ITW.  *See Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 272 F.3d 1335, 1353 (Fed Cir. 2001) ("Pleadings are judicial admissions and a party may use them to render facts indisputable."), *vac'd sub nom. DeKalb Genetics Corp. v. Bayer CropScience S.A.*, 538 U.S. 974 (2003), *modified* 345 F.3d 1366 (Fed. Cir. 2003); *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) ("For purposes of summary judgment, the courts have treated representations of counsel in a brief as admissions even though not contained in a pleading or affidavit.").

1    Plaintiffs contend that "[t]he BrakeTech machine contains a <u>fresh fluid container</u> and <u>waste</u>

2    <u>fluid container</u> in the <u>receptacle/housing</u>."  (Pls. Mem. ISO MSJ 8 (emphasis in original).)  ITW

3    advance three arguments why this is not so, and the Court addresses each in turn.

4    Initially, ITW argues that the BrakeTech does not meet the second and third limitations

5    because "Wynn's new brake fluid container is placed <u>on an external shelf on top of the chassis</u>, not

6    <u>in the chassis</u>."[9]  (ITW's Opp'n 8 (emphasis in original).)  This argument lacks merit.  The Court

7    found *supra* that the BrakeTech's chassis constitutes a housing, as required by the first limitation.

8    ITW's promotional materials and the photographs supplied by Plaintiffs clearly depict the container

9    resting "in" the chassis—the chassis supports the container, and four vertical walls surround the

10   container.  (*See, e.g.*, Kneafsey Decl. ISO Pls.' MSJ Ex. 2, at 15–16, 18–20; *id.* Ex. 7; *id.* Ex. 9; Ex.

11   11; *cf. id.* Ex. 3, at 28 (describing waste fluid container as "onboard the machine").)  ITW's argument

12   seems to be that the container is not "in" the housing because it is not surrounded on every side;

13   however, the Court doubts that ITW would seriously contend that a widget is not "in" a box because

14   the top of the box is open.

15   Next, ITW argues that the BrakeTech does not meet the second and third limitations because

16   "the user—not Wynn's—places the fresh fluid bottle on the top shelf of the chassis."  (ITW's Opp'n

17   8 (citing Hischier Decl. ¶¶ 5–6); *accord* ITW's Suppl. Br. 3 ("[B]ecause Wynn's . . . does not place

18   the new fluid tank in the housing, Wynn's does not directly infringe claim 1.").)  Although Plaintiffs

19   do not address this argument directly, suffice it to say that the patent laws do not allow a manufacturer

20   to avoid infringement simply by selling a disassembled device that would infringe on assembly.  *See,*

21   *e.g.*, *High Tech Medical Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1556 (Fed. Cir.

22   1995) ("[I]f a device is designed to be altered or assembled before operation, the manufacturer may

23   be held liable for infringement if the device, as altered or assembled, infringes a valid patent." (citing

24   *Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 19 (Fed. Cir. 1984))).

25   Regarding the fresh and waste fluid container limitations, ITW's reliance on *Cross Medical*

26   *Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005), is misplaced.

27

28       [9] Although ITW's first and second arguments on this point do not explicitly address the waste fluid container, they apply equally to the third limitation.

1    There, the patent-in-suit claimed an orthopedic surgical implant used to stabilize and align the bones

2    of a patient's spine, comprising "an anchor seat means which has a lower bone interface *operatively*

3    *joined* to [a] bone segment." *Id.* at 1299.  The Federal Circuit construed the "operatively joined"

4    limitation to require that "the interface and the bone segment are connected and in contact such that

5    the device is effective to perform posterior stabilization." *Id.* at 1306.  Because the operatively joined

6    limitation required that the anchor seat be in contact with bone, and because the defendant did not

7    itself make an apparatus with the interface in contact with bone, the court held that the defendant did

8    not directly infringe. *Id.* at 1311–12 ("[N]o reasonable juror could find that the accused infringer itself

9    makes or uses the entire claimed apparatus.  The anchor seat of the device does not contact bone until

10   the surgeon implants it."); *see also Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d

11   1279, 1288 (Fed. Cir. 2011) (holding that software manufacturer did not infringe patent comprising

12   "personal computer data processing means" because "[t]he customer, not Qwest, complete[d] the

13   system by providing the 'personal data processing means' and installing the client software").

14          A common thread that runs through *Cross Medical* and *Centillion Data* distinguishes the

15   relevant limitations from those at issue here.  Specifically, in each of those cases, the patents-in-suit

16   contained structural limitations requiring installation of the claimed devices on structures extrinsic to

17   the devices themselves.  That is, the accused device in *Cross Medical* could not contain every

18   limitation of the claimed surgical implant until a surgeon implanted it, thereby placing the interface

19   in contact with bone, 424 F.3d at 1311–12, and the accused billing system in *Centillion Data* did not

20   contain every limitation of the claimed system until a customer installed it, thereby providing a

21   "personal computer data processing means," 631 F.3d at 1288.  Thus, in each case, the accused

22   infringer sold a device that—on its own—did not infringe.  Infringement could occur only if the

23   accused infringer's customer installed the device on another structure.  In contrast, the limitations at

24   issue here—fresh and waste fluid tanks "in said housing"—merely require the customer to assemble

25   parts of one good sold by ITW (or two separate goods, both sold by ITW, *see infra*) into a single

26   structure.  Accordingly, the rule from *Paper Converting* and *High Tech Medical*, rather than that from

27   *Cross Medical* and *Centillion Data*, controls.[10]

28   _____

         [10] *Paper Converting* and *High Tech Medical* are discussed in greater detail *infra*.

1    Finally, ITW argues that the BrakeTech does not meet the second limitation because "Wynn's

2  new fluid container is sold separately, and it is not in the housing when sold."  (ITW's Opp'n 8.)

3  According to ITW, if the BrakeTech is not sold with a fresh fluid container, it does not literally

4  infringe claims 1 and 6 as sold because it does not contain every limitation of the asserted claims.

5  (ITW's Opp'n 7 ("Plaintiffs have failed to establish . . . that Wynn's BrakeTech machine literally

6  meets every limitation of every asserted apparatus claims . . . ."); *see Riles*, 298 F.3d at 1308.)

7  Plaintiffs contend that this argument lacks merit for three reasons.  (Pls.' Mem. ISO MSJ 8–9; Pls.'

8  Reply 3–4; Pls.' Suppl. Br. 1–7.)

9    First, Plaintiffs dispute ITW's major premise, arguing that ITW ships new fluid containers

10  "<u>with the machines</u>."  (Pls.' Reply 3 (quoting Kneafsey Decl. ISO Pls.' MSJ Ex. 10 (emphasis in

11  original)).)  In support of this contention, Plaintiffs point to an e-mail from Mark Hischier, Wynn's

12  director of technology (Hischier Decl. ¶ 1).  (Pls.' Reply 3 (citing Kneafsey Decl. ISO Pls.' MSJ Ex.

13  10).)  Mr. Hischier's e-mail states: "Our new brake fluid (1/2 gallon bottles, new labels, not EBS

14  related) will arrive late Feb [sic] in time for shipment *with the machines* in March!" (Kneafsey Decl.

15  ISO Pls.' MSJ Ex. 10 (emphasis added).)  The Court does not, as Plaintiffs suggest, read this statement

16  as unequivocally indicating that the containers and the BrakeTech are shipped together.  Rather, this

17  statement can also be read as indicating that the containers and the BrakeTech would ship at the same

18  time.  Accordingly there is a genuine issue of fact as to whether ITW sells the Braketech in the

19  patented configuration—with fresh and waste fluid containers.[11]

20    Second, Plaintiffs contend that ITW is liable for infringement because "the claims recite

21  capability and the BrakeTech is capable of storing fresh and waste fluid tanks in the housing."  (Pls.'

22  Reply 4.)  "[T]o infringe a claim that recites capability and not actual operation, an accused device

23  'need only be capable of operating' in the described mode." *Finjan, Inc. v. Secure Computing Corp.*,

24  _____

25    [11]  Although ITW does not argue that the waste fluid container is sold separately (*see* ITW's
Opp'n 8 ("Wynn's *new fluid container* is sold separately . . . ." (emphasis added))), the evidence

26  regarding whether the BrakeTech is sold with a waste fluid container is contradictory.  Defendant's
expert states that "the Wynn's Machine utilizes an empty new fluid container *supplied by the operator*

27  for the waste fluid."  (Arnold Decl. ISO ITW's Opp'n Ex. A, at 15 (emphasis added); *accord id.* at
74.)  However, ITW's BrakeTech Assembly Instructions and Parts List contain a reference to part

28  number 5555556, a "BOTTLE – OPAQUE (HDPE) – 1/2 G," which appears to be a waste fluid
container.  (Kneafsey Decl. ISO Pls.' MSJ Ex. 6, at 64.)  Accordingly, a genuine issue of fact exists
regarding whether the BrakeTech is sold with a waste fluid container.

626 F.3d 1197, 1204 (Fed. Cir. 2010) (quoting *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed Cir. 1991)).  "Thus, depending on the claims, 'an accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of noninfringing modes of operation.'"  *Id.* at 1204 (quoting *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001)).

In *Finjan*, the defendants argued "that they sold no infringing products because all software modules that featured [the allegedly infringing function] were locked when sold."  626 F.3d at 1203. The Federal Circuit rejected this argument, concluding that "Finjan's non-method claims describe[d] capabilities without requiring that any software components be 'active' or 'enabled.'"  *Id.* at 1204–05. For example, the claims recited software components "*for preventing* execution," "*for obtaining* a Downloadable," "*for forming* a sandbox package," and "*for causing*" a server or a computer to perform certain steps.  *Id.* at 1205 (first, second, and third emphases in original); *see also Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002) ("[A]n infringing software must include the 'means *for scoring* . . . bonus points' regardless whether that means is activated or utilized in any way.").

The Court agrees with Plaintiffs that the second and third limitations do, to an extent, recite capability rather than actual operation.  That is, claims 1 and 6 recite an apparatus comprising, *inter alia*, "a fresh fluid tank in said housing *for storing* a source of fresh hydraulic fluid," '055 Patent col.8 ll.11–12 (claim 1) (emphasis added); *id.* col.8 ll.55–56 (claim 6), and "a waste fluid tank in said housing *for receiving and storing* a source of waste hydraulic fluid," *id.* col.8 ll.13–14 (claim 1) (emphasis added); *id.* col.8 ll.57–58 (claim 6).  Thus, to satisfy the limitations, an apparatus need only include a "fresh fluid tank" and "waste fluid tank" in the housing *capable of* "storing a source of fresh hydraulic fluid" and "receiving and storing a source of waste hydraulic fluid," respectively.

The Court does not agree, however, that the second and third limitations recite capability for "storing fresh and waste fluid tanks in the housing."  (Pls.' Reply 4.)  These limitations manifestly are not directed to the housing—they are directed to the fresh and waste fluid tanks.  And they are explicit that the tanks must be "in said housing."  '055 Patent col.8 ll.11–12 (claim 1); *id.* col.8 ll.13–14 (claim 1); *id.* col.8 ll.55–56 (claim 6); *id.* col.8 ll.57–58 (claim 6).  Thus, contrary to Plaintiff's contention,

1    the BrakeTech does not meet limitations two and three simply because it can store fresh and waste

2    fluid tanks in the housing.

3            Third, Plaintiffs posit that ITW "cannot escape [liability for] infringement merely by separately

4    shipping a claimed element of the BrakeTech."[12]  (Pls.' Suppl. Br. 5.)  Plaintiffs cite *High Tech*

5    *Medical*, 49 F.3d at 1556 (citing *Paper Converting*, 745 F.2d at 19), for the proposition that "if a

6    device is designed to be altered or assembled before operation, the manufacturer may be held liable

7    for infringement if the device, as altered or assembled, infringes a valid patent."  (Pls.' Suppl. Br. 5.)

8            In *Paper Converting*, which the *High Tech Medical* court relied on for the above-cited

9    proposition, the defendant entered into a contract to sell the patented combination—a high-speed

10   rewinder—before the patent expired.  745 F.2d at 15–16.  To avoid infringement, the defendant

11   carefully constructed and tested the rewinder in stages, never assembling the completed machine.  *Id.*

12   Once construction and testing was complete, the defendant shipped separate components to the

13   customer with instructions not to assemble the rewinder until two days after the expiration of the

14   patent.  *Id.*  Given the amount of testing performed, coupled with the sale and delivery of components

15   "ready for assembly and with no useful noninfringing purpose," the court held that the defendant had

16   infringed the patent.  *Id.* at 19.  *But see Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1252

17   n.2 (Fed. Cir. 2000) ("[O]ne may not be held liable under [35 U.S.C.] § 271(a) for 'making' or

18   'selling' less than a complete invention." (citing *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S.

19   518 (1972))).

20           *Paper Converting* is not entirely on point, however.  The defendant in that case sold the

21   components of the infringing device together with explicit instructions on how to assemble them into

22   the patented combination.  Here, in contrast, there is a genuine issue of material fact as to whether

23   ITW sells all of the elements of the patented combination as a single, albeit disassembled, unit.  Thus,

24   a more apt comparison is to *Immersion Corp. v. Sony Computer Entertainment America, Inc.*, 2005

---

26           [12]  Because Plaintiffs did not raise this issue with any degree of specificity until their post-
27   hearing supplemental brief (*see* Pls.' Mem. ISO MSJ 8–9; Pls.' Reply 3–4), ITW has not had a
     meaningful opportunity to respond to it.  Although the Court declines to consider this argument
28   waived—as it rightfully could, *see Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1289 n.4 (9th Cir.
     2000) ("[I]ssues cannot be raised for the first time in a reply brief.")—the Court treats it with
     appropriate skepticism.

1    U.S. Dist. LEXIS 4777 (N.D. Cal. Jan. 10, 2005).  There, the patents-in-suit claimed devices for

2    providing tactile feedback to users of interactive computer applications.  *Id.* at *4.  After a jury

3    returned a verdict in Immersion's favor, the accused infringer—Sony—moved for judgment as a

4    matter of law, arguing that it sold "mere component of the invention, not the entire system or

5    apparatus, and therefore did not infringe the patents as a matter of law." *Id.* at *13.  The court rejected

6    this argument, concluding that "the jury could reasonably have found that [Sony] sells a complete and

7    operable system or apparatus rather than mere constituent parts, despite the fact that most of the

8    consoles, controllers and games are sold separately." *Id.* at *16.  In support of its holding, the court

9    noted that Sony advertised and sold all of the accused products as a single system and that it frequently

10   highlighted the compatibility between system elements. *Id.* Moreover, users needed to perform "only

11   a few simple steps to connect the consoles, controllers[,] and games, after which the means to infringe

12   [were] present." *Id.*

13        Likewise, ITW advertises and sells the BrakeTech as a single system (*see* Kneafsey Decl. ISO

14   Pls.' MSJ Exs. 5, 7, 9, 21) and highlights the compatibility between the BrakeTech and ITW's

15   containers of fresh brake fluid (*id.* Ex. 8 (advertising "Wynn's Super Heavy Duty DOT 3 and DOT

16   4 Brake Fluid" as "specifically for use with Wynn's BrakeTech™ Rapid Brake Fluid Exchange

17   Machine")).  Also, BrakeTech users "need perform only a few simple steps to connect" the BrakeTech

18   to a fresh fluid container. *Immersion*, 2005 U.S. Dist. LEXIS 4777, at *16; *see* Kneafsey Decl. ISO

19   MSJ Ex. 3, at 28; *id.* Ex. 8, at 68 ("Bottle size and threads are compatible with the pick-up tube/float

20   switch assembly on the Wynn's BrakeTech . . . .").  Thus, as in *Immersion*, a reasonable jury could

21   conclude that ITW sells a complete and operable apparatus, as opposed to mere components, even if

22   the BrakeTech and the fresh and waste fluid containers are sold separately.  But this does not mean

23   that ITW sells a complete system *as a matter of law*; rather, a jury must make that factual finding in

24   the first instance. *See Immersion*, 2005 U.S. Dist. LEXIS 4777, at *16–17.

25   (c)    Fourth Limitation

26        The fourth limitation of claims 1 and 6 is "a fill pump for dispensing hydraulic fluid from said

27   source of fresh hydraulic fluid to the hydraulic fluid system in the vehicle through a fill hose

28   interconnecting said fresh fluid tank and the hydraulic fluid system." '055 Patent col.8 ll.16–19 (claim

1); *id.* col.8 ll.60–63 (claim 6).  The Court construed the term "a fill hose interconnecting said fresh fluid tank and the hydraulic fluid system" to mean "a tube forming part or all of a connection between a fresh fluid tank and the hydraulic fluid system, for carrying hydraulic fluid from said tank to said system."  (Claim Construction Order 3.)

Plaintiffs contend that the BrakeTech contains a fill hose that connects to a "pick-up tube assembly which [sic] is inserted into the container of new brake fluid" and "enters and exits the fuel pump . . . which forces hydraulic fluid through it and then passes through the opposite end of the housing where it connects to the master cylinder through an adaptor [sic]."  (Pls.' Mem. ISO MSJ 10.)  ITW responds that the BrakeTech does not meet the fourth limitation because "the user must connect the pressure line . . . with the hydraulic fluid system of the vehicle."  (ITW's Opp'n 9.)

Like the operatively joined limitation in *Cross Medical*, 424 F.3d at 1309–12, the fourth limitation of claims 1 and 6 requires installation of the BrakeTech on an extrinsic structure.  Although the first portion of the limitation recites capability, requiring a fill pump merely capable of dispensing hydraulic fluid from a source of fresh hydraulic system to the hydraulic fluid system in a vehicle, *see Finjan*, 626 F.3d at 1203–05, the second portion recites structure.  That is, a device must contain a fill hose "forming part or all of a connection between" the fresh fluid tank and the vehicle's hydraulic system to meet the second portion of the limitation.  (Claim Construction Order 3.)  And a fill hose forming a connection between the fresh fluid tank and the vehicle's hydraulic system is absent until the technician physically attaches the BrakeTech's pressure line to the vehicle's master cylinder during brake fluid service.  (*See* Kneafsey Decl. ISO MSJ Ex. 3, at 29 (describing procedure for connecting "the pressure line of the machine . . . to the master cylinder adapter").)  Accordingly, ITW does not directly infringe claims 1 and 6 because it does not itself make or sell an apparatus with a fill hose forming a connection between a fresh fluid tank and a vehicle.  *See Cross Medical*, 424 F.3d at 1311–12.

(d)      Fifth Limitation

The fifth limitation of claim 1 is "an adapter disposed between said fill hose and the hydraulic fluid system for removably connecting said fill hose to the hydraulic fluid system, said adapter sized and configured to sealably connect to a vehicle brake master cylinder in the hydraulic fluid system of

1  the vehicle." '055 Patent col.8 ll.20–24.  The fifth limitation of claim 6 is "an adapter disposed

2  between said fill hose and the hydraulic fluid system for removably connecting said fill hose to the

3  hydraulic fluid system." *Id.* col.8 ll.64–66.

4        Plaintiffs contend that "Wynn's BrakeTech includes many adapters . . . , and they are made

5  with 'sealing rubber' and designed to be leak proof." (Pls.' Mem. ISO MSJ 10.)  ITW advances three

6  arguments in response.

7        First, ITW argues that "adapters re not part of the BrakeTech machine; instead, the adapters

8  are sold at an additional charge."  (ITW's Opp'n 9.)  This argument lacks merit.  ITW's Product

9  Specification Sheet for the BrakeTech shows that ITW sells the BrakeTech in a version that does

10  include the adapter set, (*see* Kneafsey Decl. ISO Pls.' MSJ Ex. 9), and ITW has given the "BrakeTech

11  Machine w/Adapter Set" its own discrete item number (*id.*; *see also id.* Ex. 21, at 129).  Accordingly,

12  there is no genuine issue of material fact that ITW sells the BrakeTech and associated adapters as a

13  single product.

14        Second, ITW argues that the BrakeTech's adapters are not sized and configured to "sealably

15  connect" to a vehicle brake master cylinder because "[t]he seal formed between the master cylinder

16  reservoir is not leak-proof; rather, brake fluid often leaks from the connection."  (ITW's Opp'n 9; *see,*

17  *e.g.*, Arnold Decl. ISO ITW's Opp'n Ex. C, at 110–11.)  The Court construed the term "sealably

18  connect" to mean "to connect in a manner that restrains leakage from the connection."  (Claim

19  Construction Order 3.)  Contrary to ITW's suggestion, the adapters need not be "leak-proof" to meet

20  the fifth limitation of claim 1; rather, the adapters need only "limit or restrict" leakage.  WEBSTER'S

21  THIRD NEW INTERNATIONAL DICTIONARY, *supra*, at 1936 (defining "restrain"); *accord* THE

22  AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, *supra*, at 1487; *cf. Wahpeton Canvas*

23  *Co. v. Frontier, Inc.*, 870 F.2d 1546, 1548 n.2 (Fed. Cir. 1989) ("[I]nferior infringement is still

24  infringement.").  ITW's Operating Procedures Manual clearly contemplates that the adapters are

25  capable of restraining leakage.  (*See* Kneafsey Decl. ISO Pls.' MSJ Ex. 3, at 29.)  Specifically, the

26  manual contains the following instruction: "Check for leaks around the adapter and master cylinder

27  reservoir.  If a leak is present, correct the leak before proceeding."  (*Id.*)  If the adapters could not

28  restrain leakage, then it would be impossible to "correct the leak before proceeding."  (*Id.*)

1    Third, ITW contends that the BrakeTech does not meet the fifth limitation of either claim

2  because "the user—not Wynn's—connects the adapter to the to the pressure line and the hydraulic

3  fluid system." (ITW's Opp'n 9.)  This argument is well taken.  Like the fill hose portion of the fourth

4  limitation, the fifth limitation of each claim is structural—it requires an adapter "disposed between"

5  the fill hose and the hydraulic system.  And no adapter is disposed between the fill hose and the

6  vehicle's hydraulic system until a technician physically attaches the BrakeTech's master cylinder

7  adapter to the vehicle's master cylinder reservoir during brake fluid service.  (Kneafsey Decl. ISO

8  Pls.' MSJ Ex. 3, at 29 (describing procedure for attaching "the proper master cylinder adapter onto

9  the master cylinder reservoir").)  Because ITW does not itself make or sell the BrakeTech with an

10  adapter "disposed between" a fill hose and a vehicle, ITW does not directly infringe claims 1 and 6.

11  *See Cross Medical*, 424 F.3d at 1311–12.

12  (e)    Sixth Limitation

13    The sixth limitation of claims 1 and 6 is "a vacuum pump for suctioning hydraulic fluid from

14  the hydraulic fluid system of the vehicle to said waste fluid tank through one or more bleeder valve

15  hoses interconnecting the hydraulic fluid system and said waste fluid tank." '055 Patent col.8 ll.25–29

16  (Claim 1); *id.* col.8 l.54 (Claim 6).  The Court construed the term "a vacuum pump for suctioning

17  hydraulic fluid from the hydraulic fluid system of the vehicle to said waste fluid tank" to mean "a

18  device that uses suction for drawing hydraulic fluid through it from a hydraulic fluid system to a

19  container."  (Claim Construction Order 4.)  And the Court construed the term "bleeder valve hoses

20  interconnecting the hydraulic fluid system and said waste fluid tank" to mean "one or more tubes

21  connected to the vacuum pump capable of extracting hydraulic fluid from the hydraulic fluid system

22  to the waste fluid tank."  (*Id.*)

23    According to Plaintiffs, "[i]t is undisputed that the BrakeTech has a vacuum pump" that

24  "suctions hydraulic fluid from the hydraulic fluid system through the bleeder valves interconnecting

25  the hydraulic fluid system to the waste tank."  (Pls.' Mem. ISO MSJ 11.)  ITW responds that the

26  BrakeTech does not meet the sixth limitation because "the BrakeTech vacuum pump is not strong

27  enough to draw the automobile's hydraulic fluid system to a container" and "[t]he user must connect

28  the bleeder valve hoses to the automobile."  (ITW's Opp'n 9.)

ITW's first argument reads into the sixth limitation a requirement that does not exist. As Plaintiffs point out, claims 1 and 6 "do not require that the invention be capable of operating as a vacuum only machine." (Pls.' Reply 6.) Rather, the invention need only contain "a device that uses suction for drawing hydraulic fluid through it from a hydraulic fluid system to a container." (Claim Construction Order 4.) ITW's own documents make clear that the BrakeTech meets this limitation. (*See* Kneafsey Decl. ISO Pls.' MSJ Ex. 9, at 71 ("Vacuum is applied at each wheel *to draw out the used fluid*.") (emphasis added); *id.* Ex. 13, at 90 ("The vacuum pump . . . draws from the suction hose and toggle switch block *to pump the used brake fluid into the waste bottle*.") (emphasis added); *id.* Ex. 21 ("Vacuum supplied from the machine *will draw fluid from the wheel cylinders . . . .*") (emphasis added); *see also* Arnold Decl. ISO ITW's Opp'n Ex. G, at 186 (ITW's expert, admitting that the vacuum pump draws "some" hydraulic fluid from the hydraulic fluid system).)

Plaintiffs argue that ITW's second contention "ignore[s] that the claims recite 'capability.'" (Pls.' Reply 7.) This argument misses the mark. The sixth limitation recites capability only insofar as it requires a vacuum pump capable of drawing hydraulic fluid through it from a hydraulic fluid system to a container. *See Finjan*, 626 F.3d at 1203–05. They do not recite capability for connecting to a vehicle, as Plaintiffs contend. Like the fourth limitation, the sixth limitation requires installation of the BrakeTech on an extrinsic structure—it requires bleeder valve hoses "forming part or all of a connection between the hydraulic fluid system and the waste fluid tank." (Claim Construction Order 4.) Until the technician physically attaches the BrakeTech's bleeder valve hoses to a vehicle's wheels' bleed screws via the Universal Rubber Bleeder Fittings this requirement is not met. (*See* Kneafsey Decl. ISO MSJ Ex. 3, at 29 (describing procedure for connecting "the Universal Rubber Bleeder Fittings to each wheel's bleed screw").) Accordingly, ITW does not directly infringe claims 1 and 6 because it does not make or sell an apparatus with bleeder valve hoses forming a connection between a waste fluid tank and a vehicle. *See Cross Medical*, 424 F.3d at 1311–12.

(f)     Conclusion

There are triable issues of fact regarding whether ITW makes or sells the BrakeTech with fresh and waste fluid containers and, assuming it does not, whether ITW makes or sells a complete and operable apparatus, rather than mere constituent parts. Ultimately, however, these factual issues are

1    of little moment because, for the reasons stated *supra*, ITW does not make or sell an apparatus

2    containing the fourth, fifth, and sixth limitations of claims 1 and 6.

3    *(2)      Whether ITW Offers to Sell the Patented Combination*

4         Plaintiffs also argue that, even if ITW does not make or sell the patented combination, it is

5    nonetheless liable for infringement because it offers to sell the BrakeTech in the infringing

6    configuration.  (*E.g.*, Pls.' Reply 3–4 ("It is also undisputed that Wynn's advertises and offers for sale

7    the BrakeTech Machine with the fresh and waste fluid tanks in the housing."); *accord* Pls.' Suppl. Br.

8    1–2.)  Under 35 U.S.C. § 271(a), whoever "offers to sell . . . any patented invention . . . infringes the

9    patent."  The Federal Circuit "define[s] § 271(a)'s 'offer to sell' liability according to the norms of

10   traditional contractual analysis."  *Rotec Indus.*, 215 F.3d at 1254–55.  Thus, "'offer to sell' is to be

11   interpreted according to its ordinary meaning in contract law, as revealed by traditional sources of

12   authority."  *Id.* at 1255.

13        To constitute an offer to sell under § 271(a), "an offer must create a power of acceptance in

14   the offeree."  *Xactware, Inc. v. Symbility Solution Inc.*, 402 F. Supp. 2d 1359, 1368 (D. Utah 2005)

15   (citing *Moldflow Corp. v. Simcon, Inc.*, 296 F. Supp. 2d 34, 43–44 (D. Mass. 2003)).  "[T]o have the

16   power of acceptance [the] offer must be sufficiently definite.  Therefore, the lack of definite terms in

17   a communication makes that communication only an advertisement or a solicitation."  *Id.*; *accord*

18   *Ductcap Prods., Inc. v. J & S Fabrication, Inc.*, 2009 WL 3242022, at *3 (D. Minn. 2009) ("Under

19   contract law, an offer is a communication 'which the other party could make into a binding contract

20   by simple acceptance.'" (quoting *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed.

21   Cir. 2001))).[13]

22        In *Moldflow*, Simcon's marketing representative contacted several companies by sending

23   Simcon's promotional materials in the form of "flyers."  296 F. Supp. 2d at 44.  Although the flyers

24   _____

25        [13] In support of their argument that ITW offered to sell the Braketech within the meaning of
     § 271(a), Plaintiffs rely exclusively on *3D Systems, Inc. v. Aarotech Laboratories, Inc.*, 160 F.3d 1373
26   (Fed Cir. 1998).  (*See* Pls.' Suppl. Br. 1–2.)  There, the Federal Circuit held that the defendant's price
     quotation letters to California residents that included a description of the infringing product constituted
27   offers to sell under § 271(a).  *3D Sys.*, 160 F.3d at 1379.  However, Plaintiffs ignore the "much
     different analysis" of § 271(a)'s offer to sell liability that the Federal Circuit conducted in *Rotec*.
28   *Xactware*, 402 F. Supp. 2d at 1367.  In light of *Rotec*, *3D Systems*' continuing viability is
     questionable.  *See, e.g.*, *Moldflow*, 296 F. Supp. at 42–43.  *But see MEMC Elec. Materials*, 420 F.3d
     at 1376 (citing *3D Systems* with approval).

contained a description of the allegedly infringing product, "as well as some pricing information," they "lacked other terms necessary to create the power of acceptance on the part of the recipients. Specifically, the materials did not include information about quantity, time of delivery, or terms of payment." *Id.* The court held that Simcon's flyers were not offers to sell under § 271(a) because "none of the companies that received the promotional materials could contractually bind Simcon without at least some additional negotiations as to these terms." *Id.*[14]

Here, ITW's advertisements "describe[] and depict" the Braketech in the infringing configuration and "include[] pricing for the machine and the fresh fluid tanks for the distributors." (Pls.' Suppl. Br. 1 (citing Kneafsey Decl. ISO Pls.' MSJ Ex. 21); *see also* Kneafsey Decl. ISO Pls.' MSJ Exs. 5, 7, 9.)   Nevertheless, the advertisements "lack[] the definite terms that would create a binding contract between [ITW] and the recipient if the recipient simply accepted." *Ductcap Prods.*, 2009 WL 3242022, at *3.   Because ITW's advertisements "[do] not include information about quantity, time of delivery, or terms of payment," *Moldflow*, 296 F. Supp. 2d at 44, none of the distributors that received the advertisements could contractually bind ITW without further negotiation. Accordingly, the advertisements are not sufficiently definite to create the power of acceptance, and, as a matter of law, they are not "offers to sell" under § 271(a).

*(3)      Whether ITW Uses the Patented Combination*

Finally, Plaintiffs contend that, even if ITW does not make, sell, or offer to sell the patented combination, ITW is nevertheless liable for infringement because it uses the BrakeTech in the infringing configuration.   (*E.g.*, Pls.' Reply 4 ("Wynn's also <u>uses</u> the BrakeTech with the fresh and waste fluid tank[s] in the housing . . . ." (emphasis in original)); *accord* Pls.' Suppl. Br. 5–6.)   In support of this argument, Plaintiffs primarily focus on an ITW "training video" entitled "How to [O]perate a Wynn's Brake Flush Machine."   (*Id.* (citing Kneafsey Decl. ISO Pls.' MSJ Ex. 11).)   The video depicts a technician operating the BrakeTech with fresh and used fluid containers in the housing,

---

[14] *See also MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1376 (Fed. Cir. 2005) (concluding that e-mails containing description of infringing product but not price terms could not be construed as "offers to sell" under § 271(a)); *Ductcap Prods.*, 2009 WL 3242022, at *3 (concluding that advertisements "lacked the definite terms that would create a binding contract between [the defendant] and the recipient" because "material terms, including price, quantity, and terms of delivery, needed to be negotiated").

as required by second and third limitations; with a fill hose "interconnecting" the fresh fluid tank and the hydraulic system, as required by the fourth limitation; with an adapter "disposed between" the fill hose and the hydraulic system, as required by the fifth limitation; and with bleeder valve hoses "interconnecting" the hydraulic system and the waste fluid tank, as required by the sixth limitation. (*See* Kneafsey Decl. ISO Pls.' MSJ Ex. 11; *accord* WynnsProducts, *How to Operate a Wynn's Brake Flush Machine*, YOUTUBE (Nov. 21, 2007), http://www.youtube.com/watch?v=T3sV1tH_GN0.)

A finding of infringement can rest on a single use of an infringing product. *See Lucent Techs.*, 580 F.3d at 1317; 35 U.S.C. § 271(a). However, "[t]he inquiry as to what constitutes a 'use' of a patented item is highly case-specific." *Medical Solutions, Inc. v. C Change Surgical LLC*, 541 F.3d 1136, 1141 (Fed. Cir. 2008) (citing *Van Well Nursery, Inc. v. Mony Life Ins. Co.*, 362 F. Supp. 2d 1223, 1229 (E.D. Wash. 2005)). Several courts "have held that demonstrations of a device are not proper evidence of 'use' because using a device means using it to perform its actual function or service, not using it as a demonstrative display." *Medical Solutions*, 541 F.3d at 1141 n.4; *accord id.* at 1140 ("Several courts addressing whether a defendant has 'used' a patented invention have held that 'the mere demonstration or display of an accused product, even in an obviously commercial atmosphere' is not an act of infringement for purposes of § 271(a)." (quoting *Fluid Mgmt. Ltd. P'ship v. H.E.R.O. Indus., Ltd.*, 1997 WL 112839, at *4 (N.D.Ill. Mar. 11, 1997))).

Here, the demonstration depicted in ITW's training video depicts does not constitute an infringing "use" under 35 U.S.C. § 271(a). Claims 1 and 6 of the '055 patent claim an apparatus for "removing and replacing hydraulic fluid used in a hydraulic fluid system in a vehicle." '055 Patent col.8 ll.7–8 (claim 1); *id.* col.8 ll.51–52 (claim 6). The video Plaintiffs cite purportedly depicts a technician using the BrakeTech, in the infringing configuration, to remove and replace brake fluid used in a hydraulic system in a vehicle. However, even if the video does depict a technician operating the BrakeTech in a manner that meets each limitation of the '055 patent, ITW's single demonstration of the BrakeTech in the infringing configuration does not constitute an infringing "use" of the product as a matter of law. *See L.A. Gear, Inc. v. E.S. Originals, Inc.*, 859 F. Supp. 1294, 1298 (C.D. Cal. 1994) ("As a matter of law, merely observing an allegedly infringing device, demonstrating that device, or observing a demonstration of that device does not constitute a 'use' of that device."); *cf.*

1     *Intermedics, Inc. v. Ventritex, Inc.*, 775 F. Supp. 1269, 1286 (N.D. Cal. 1991) ("[P]laintiff's failure

2     to present evidence that the demonstrations led to any sales of the Cadence strongly suggests that the

3     defendants' demonstration activity does not constitute an act of infringement under § 271(a).").

4         In their post-hearing supplemental brief, Plaintiffs take another tack and for the first time cite

5     evidence other than the ITW's training video to show that ITW uses the BrakeTech in the infringing

6     configuration. (Pls.' Suppl. Br. 5–6.) Specifically, Plaintiffs contend that ITW's internal documents,

7     training materials, and advertisements illustrate that ITW trains users on and tests the BrakeTech. (*Id.*)

8     This circumstantial evidence of use is sufficient to justify a jury verdict in Plaintiffs' favor. *See Nat'l*

9     *Instruments Corp. v. Mathworks, Inc.*, 113 F. App'x 895, 898 (Fed. Cir. 2004) (finding substantial

10     evidence to sustain jury verdict of direct and induced infringement, based on evidence of defendant's

11     training materials, which taught how to use accused product to perform the infringing methods, and

12     evidence that accused product during its normal use. But this evidence can also be innocently

13     explained, and by failing to identify it until after the summary judgment hearing, Plaintiffs deprived

14     ITW of the opportunity to respond. Accordingly, the Court declines to resolve the competing

15     inferences in Plaintiffs' favor on summary judgment. *See Therasense, Inc. v. Becton, Dickinson &*

16     *Co.*, 560 F. Supp. 2d 835, 860 (N.D. Cal. 2008); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir.

17     1996) ("Where new evidence is presented in a reply to a motion for summary judgment, the district

18     court should not consider the new evidence without giving the non-movant an opportunity to respond."

19     (alterations in original and internal quotation marks omitted)).

20     **B.**     **Dependent Apparatus Claims (Claims 3–5, 7, and 9–11)**

21         Claims 3–5 depend from claim 1, and claims 7 and 9–11 depend from claim 6. As stated

22     *supra*, factual disputes preclude summary judgment of infringement on independent claims 1 and 6.

23     Accordingly, the same factual disputes preclude summary judgment of infringement of the dependent

24     claims. *See Wahpeton Canvas Co.*, 870 F.2d at 1552 n.9.

25     **C.**     **Method Claims (Claims 12 and 14–15)**

26         Plaintiffs also assert that ITW infringes the '055 patent's independent method claim, claim 12,

27     as well as claims 14 and 15, which depend from and contain all the limitations of claim 12. (*See* Pls.'

28     Mem. ISO MSJ 16–19.) According to ITW, "Plaintiffs have failed to meet their burden of

1   establishing—as a matter of law and with no facts in dispute—that Wynn's performs all of the steps

2   of any of the asserted method claims . . , in the order that those steps must be performed."  (ITW's

3   Opp'n 12.)

4          "To infringe a method claim, a person must have practiced all of the steps in the claimed

5   method."  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009).  "The sale of

6   [an apparatus capable of performing a claimed process is] not a direct infringement because a method

7   or process claim is directly infringed only when the process is performed."  *Joy Techs., Inc. v. Flakt,*

8   *Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993).  Rather, "[t]o be a direct infringer of [a] method claim[], [the]

9   defendant must have been found to have used the [apparatus] in question in the manner prescribed in

10  the method claim[]."  *Id.* at 774 (quoting *Dennison Mfg. Co. v. Ben Clements & Sons, Inc.*, 467 F.

11  Supp. 391, 427 (S.D.N.Y. 1979)) (internal quotation marks omitted); *accord Ormco Corp. v. Align*

12  *Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006) ("Method claims are only infringed when the

13  claimed process is performed, not by the sale of an apparatus that is capable of infringing use." (citing,

14  *inter alia*, *Joy Techs.*, 6 F.3d at 773)).

15         Some of the same issues of fact that preclude summary judgment of infringement on the '055

16  patent's apparatus claims also preclude summary judgment of infringement on the method claims.

17  Specifically, ITW's training video does not constitute an infringing "use" of the BrakeTech as a matter

18  of law, and Plaintiffs' other evidence of use, which they did not identify until after the summary

19  judgment hearing, is not entitled to dispositive weight.  Accordingly, even assuming that ITW's

20  method of operating the BrakeTech infringes the '055 patent's method claims, there are genuine issues

21  of fact regarding whether ITW uses the BrakeTech to practice that method.

22               **ITW'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY**

23         ITW moves for summary judgment of invalidity of the '055 patent on a theory of obviousness.

24  (ITW's Mem. ISO MSJ 4.)  According to ITW, the '055 patent "simply combines elements of the prior

25  art pressure bleeders, with elements of the prior art vacuum bleeders or tools, to achieve the same

26  result—removal and replacement of brake fluid."  (*Id.* at 1.)

27  //

28  //

1    **1.      Legal Standard**

2         A patent is invalid for obviousness if "the differences between the subject matter sought to be

3    patented and the prior art are such that the subject matter as a whole would have been obvious at the

4    time the invention was made to a person having ordinary skill in the art."  35 U.S.C. § 103(a).

5    Whether the claimed subject matter would have been obvious to an ordinarily skilled artisan at the

6    time of the invention "is a question of law based on underlying questions of fact."  *Green Edge*

7    *Enters., LLC v. Rubber Mulch Etc.*, 620 F.3d 1287, 1298 (Fed. Cir. 2010).  The underlying factual

8    inquiries include: (1) "the scope and content of the prior art"; (2) "differences between the prior art

9    and the claims at issue"; (3) "the level of ordinary skill in the pertinent art"; and (4) relevant secondary

10   considerations, including "commercial success, long felt but unsolved needs, [and] failure of others."

11   *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007) (quoting *Graham v. John Deere Co. of Kan.*

12   *City*, 383 U.S. 1, 17–18 (1966)).  Summary judgment of obviousness is appropriate if "the content of

13   the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in dispute,

14   and the obviousness of the claim is apparent in light of these factors."  *Id.* at 427.  Conversely, a

15   factual dispute as to any one of these elements will defeat a motion for summary judgment.  *See*

16   *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000).

17        "The combination of familiar elements according to known methods is likely to be obvious

18   when it does no more than yield predictable results."  *KSR*, 550 U.S. at 416.  If an ordinarily skilled

19   artisan can implement a predictable variation of a work available in the same field of endeavor, 35

20   U.S.C. § 103 likely bars its patentabiltity.  *Id.* at 417.  However, "a patent composed of several

21   elements is not proved obvious merely by demonstrating that each of is elements was, independently,

22   known in the prior art."  *Id.* at 418.

23        Determining whether a patent claiming a combination of known elements would have been

24   obvious "usually entails considering the 'interrelated teachings of multiple patents; the effects of

25   demands known to the design community or present in the marketplace; and the background

26   knowledge possessed by a person having ordinary skill in the art, all in order to determine whether

27   there was an apparent reason to combine the known elements in the fashion claimed by the patent at

28   issue.'"  *Trimed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1341 (Fed. Cir. 2010) (quoting *KSR*, 550 U.S.

at 418).  Identifying a motivation to combine can be important because "inventions in most, if not all, instances rely upon building blocks since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *KSR*, 550 U.S. at 418–19.  "[A]ny need known in the field of endeavor at the time of the invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 420.

Additionally, a patent's subject matter can be proved obvious "by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims." *Id.* at 419–20; *see also Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2010) (holding that obviousness analysis "may include recourse to logic, judgment, and common sense available to a person of ordinary skill that do not necessarily require explication in any reference or expert opinion").  "When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within her technical grasp.  If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense." *KSR*, 550 U.S. at 420.

Relatedly, "[a] finding that a reference teaches away can preclude a finding that the reference renders a claim obvious." *In re Chapman*, 595 F.3d 1330, 1337 (Fed. Cir. 2010) (citing *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009)); *accord Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, — F.3d —, 2011 WL 3768983, at *8 (Fed. Cir. Aug. 26, 2011) ("[T]he fact-finder must not only determine what the prior art teaches, but whether prior art teaches away from the claimed invention and whether there is a motivation to combine teachings from separate references.").  "Whether or not a reference teaches away from a claimed invention is a question of fact." *In re Chapman*, 595 F.3d at 1337 (citing *In re Napier*, 55 F.3d 610, 613 (Fed. Cir. 1995)).

Because patents are presumed valid, 35 U.S.C. § 282, the invalidity of patent claims must be shown by clear and convincing evidence. *Hearing Components, Inc. v. Shure*, 600 F.3d 1357, 1366 (Fed. Cir. 2010).

//

1   **2.      Analysis**

2          Here, the level of ordinary skill in the pertinent art is not in dispute.[15]   (ITW's Mem. ISO MSJ

3   4–5.)   Thus, the factual issues in dispute are (1) the scope and the content of the prior art, (2) the

4   differences between the prior art and the '055 patent's claims, and (3) the existence and significance

5   of pertinent secondary considerations.

6          ITW cites five prior art devices or groups of prior art devices[16] and dozens of prior art patents[17]

7   that it claims render the '055 patent's claims obvious.   (ITW's Mem. ISO MSJ 5–11.)   The prior art

8   falls into two categories: pressure bleeders and vacuum bleeders.   According to ITW, "[t]he alleged

9   invention of the '055 patent simply combines familiar elements of prior art pressure bleeders, along

10  with elements of the prior art vacuum bleeders, to achieve predictable results—the replacement of

11  substantially all of the brake fluid in an automobile."   (ITW's Reply 1; *accord* ITW's Mem. ISO MSJ

12  1.)

13         According to Plaintiffs, factual disputes regarding the scope and content of the prior art, and

14  the differences between the prior art and the '055 patent's claims preclude summary judgment of

15  invalidity on the ground of obviousness.   (Pls.' Opp'n 11–20.)   Plaintiffs also contend that "ITW

16  entirely ignores the objective evidence of nonobviousness," which "<u>must</u> be considered."   (*Id.* at 24

17  (emphasis in original).)

18         As an initial matter, ITW has not demonstrated the presence of a motivation, based in common

19

20         [15]   ITW agrees with Plaintiffs' definition of the ordinary skill in the art:

21         One of ordinary skill in the art would have working knowledge of hydraulic systems,
           working knowledge of automotive brake systems, and at least three to five years
22         experience in conceiving, designing[,] and modifying various automotive fluid
           flushing equipment, and/or, depending on the level of use, at least five years
23         experience in using, including assembling or modifying, various automotive fluid
           flushing equipment.
24
    (Arnold Decl. ISO ITW's MSJ Ex. G, at 164, ECF Nos. 99-6 to -8.)
25
26         [16]   The prior art devices include the Power Probe Brake Bleeder; the Phoenix Systems V-10
    Injector, V20-Injector, Maxi-Ject Pro, and Maxi-Ject; the Phoenix Systems Super-Pak; the AMMCO
27  Model 7300 Brake Bleeder and Model 7301 High Pressure Brake Bleeder; and the Vacula Brake
    Bleeder De Luxe, Refiller MK3, and Brake Flushing Kit.   (Arnold Decl. ISO ITW's MSJ Ex. D, at
    75–79.)
28
           [17]   (*See* Arnold Decl. ISO ITW's MSJ Ex. D, at 80–86.)

sense or otherwise, to combine a pressure bleeder with a vacuum bleeder.  *See KSR*, 550 U.S. at 418.

The closest ITW gets is to say:

> [M]otivation exists to combine one or more of the [prior art] references with each
> other.  Generally, motivation to combine any of these references exists within the
> references themselves, as well as within the knowledge of those of ordinary skill in the
> art.  The references identify and address some of the same technical issues and suggest
> very similar solutions to those issues.  Accordingly, one of ordinary skill in the art
> would have been motivated to combine the references with each other.

(Williams Decl. ISO ITW's MSJ ¶ 9, ECF No. 100-4; *see also* Williams Decl. ISO ITW's Reply ¶ 12,

ECF No. 117-2 ("[I]f I had possessed the funding to pursue brake machine design, it would have been

obvious to combine pressure and vacuum into one device, based on common sense.").)  Saying,

however, doesn't make it so.  In support of its claim, ITW does not cite a single prior art reference that

identifies the same technical issues identified in the '055 patent and "suggest[s] very similar

solutions." (Williams Decl. ISO ITW's MSJ ¶ 9.)  Rather, ITW broadly refers to a fifty-three-page

chart comparing the prior art to the '055 patent's claims.  (ITW's Mem. ISO MSJ 11 (citing Arnold

Decl. ISO ITW's MSJ Ex. D, at 28–80).)

   In the Court's view, none of the prior art cited by ITW clearly and convincingly discloses "a

reason that would have prompted a person of ordinary skill in the relevant field to combine the

elements in the way the" '055 patent does.  *KSR*, 550 U.S. at 418.  At most, the prior art identifies

some of the same technical problems associated with replacing brake fluid that the '055 patent

identifies.  For example, U.S. Patent No. 2,295,539 and U.S. Patent No. 3,548,978 discuss the labor

intensive nature of the prior art method of replacing brake fluid.  (Arnold Decl. ISO ITW's MSJ Ex.

O (U.S. Patent No. 2,295,539) col.1 l.29 to col.2 l.7; *id.* Ex. Z (U.S. Patent No. 3,548,978) col.1

ll.8–20.)  U.S. Patent No. 1,825,013, U.S. Patent No. 5,060,703, and U.S. Patent No. 4,165,819

identify the hygroscopic nature of brake fluid and the need to introducing new hydraulic fluid into a

vehicle's hydraulic system without exposing the fluid to the ambient air.  (*Id.* Ex. S (U.S. Patent No.

1,825,013) col.1 ll.9–16); *id.* Ex. U (U.S. Patent No. 5,060,703) col.1 ll.16–31; *id.* Ex. Y (U.S. Patent

No. 4,165,819) col.1 ll.13–33.)  However, each prior art reference proposes to solve the relevant

technical problem by means of pressure *or* vacuum.  Thus, questions of fact exist, not only as to

whether there is a motivation to combine, but also as to whether the prior art teaches away from the

'055 patent's combination.

1    Accordingly, the Court finds that the prior art does not establish the existence of a motivation

2    to combine pressure *and* vacuum in the manner claimed by the '055 patent. *See KSR*, 550 U.S. at 418;

3    *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1241 (Fed. Cir. 2010) (holding motivation to combine

4    existed where prior art and plaintiff's testimony disclosed known problems).   Similarly, issues of

5    material fact exist regarding whether the '055 patent's combination of pressure and vacuum was

6    obvious to try.  *See KSR*, 550 U.S. at 420.

7    Plaintiffs also contend that factual disputes regarding the scope and the content of the prior art

8    that ITW contends renders the '055 patent obvious preclude summary judgment of invalidity.  (Pls.'

9    Opp'n 10–20.)  ITW replies that Plaintiffs' attempts to create disputed issues regarding the scope and

10   content of the prior art "fall [into] two categories—factual misrepresentations, and undisputed but

11   irrelevant facts."   (ITW's Reply 5.)   Nevertheless, the Court concludes that the factual disputes

12   Plaintiffs identify preclude summary judgment.  For example, the parties dispute whether the Power

13   Probe Brake Bleeder is, in fact, prior art.  (*Compare* Delfer Decl. ¶¶ 4–6, ECF No. 100-3, *with* Hollub

14   Decl. ISO Pls.' Opp'n ¶ 16, ECF No. 108-1; *see* 35 U.S.C. § 102(b) (establishing priority date for prior

15   art).)  And factual disputes regarding the content of the prior art are legion.  (*Compare, e.g.*, Williams

16   Decl. ISO ITW's Reply ¶ 6, *with* Hollub Decl. ISO Pls.' Opp'n ¶ 23 (disputing the structure of the

17   Vacula Brake Flushing Kit); Williams Decl. ISO ITW's Reply ¶ 9, *with* Hollub Decl. ISO Pls.' Opp'n

18   ¶ 26 (disputing whether U.S. Patent No. 2,295,539 discloses a fill pump).)

19   Finally, Plaintiffs submit extensive evidence regarding secondary considerations of the '055

20   patent's nonobviousness, including evidence of commercial success, copying, praise, unexpected

21   results, and failure of others.  (Pls.' Opp'n 20–23.)   Although Plaintiffs must, as ITW points out

22   (ITW's Reply 8), demonstrate a nexus between the merits of the claimed invention and evidence of

23   secondary considerations, *Muniauction*, 532 F.3d at 1327, they will have a chance to do so at trial.

24   //

25   //

26   //

27   //

28   //

1

**CONCLUSION**

2          Genuine issues of material fact preclude summary judgment of both infringement and

3   invalidity.  Accordingly, Plaintiffs' motion for partial summary judgment of infringement and ITW's

4   motion for summary judgment of invalidity are **DENIED**.

5          **IT IS SO ORDERED.**

6

7   DATED:  September 12, 2011

8                                                 Honorable Janis L. Sammartino
                                                  United States District Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

09cv996